IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF TYLER E.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF TYLER E., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LOGAN E., APPELLANT.

Filed June 9, 2026.   No. A-25-639.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Emma J. Lindemeier, and Cassandra J. Harper, Senior Certified Law Student, for appellant.

Daniel Gubler, Deputy Douglas County Attorney, and Matt Langan, Senior Certified Law Student, for appellee.

RIEDMANN, Chief Judge, and BISHOP and FREEMAN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Logan E. appeals from the order of the separate juvenile court of Douglas County terminating his parental rights to his son, Tyler E. We affirm.

## II. BACKGROUND

Logan is the natural father of Tyler, born in August 2017. Kathleen E. is Tyler's natural mother. Kathleen voluntarily relinquished her parental rights during these same juvenile proceedings below and is not part of this appeal.

- 1 -

## 1. PROCEDURAL BACKGROUND

On April 14, 2023, the State filed a petition alleging that Tyler was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he lacked proper parental care due to the fault or habits of Logan in that:

A. Logan . . . is the father of [Tyler].

B. On or about April 13, 2023, law enforcement was dispatched to [Tyler's daycare] due to Logan . . . failing to pick up [Tyler].

C. On or about April 13, 2023, neither law enforcement nor a representative of the daycare provider . . . were [able] to make contact with Logan . . . as such [Tyler] was left without a caregiver.

D. At the time of removal, there was no one appropriate who could legally provide the care, support, supervision, and/or protection of [Tyler].

E. Logan['s] . . . use [of] alcohol and/or controlled substances places [Tyler] at risk for harm.

F. Logan . . . has an active failure to appear bench warrant out of Sarpy County, Nebraska.

G. Logan . . . has a pending criminal matter in the District Court of Sarpy County, Nebraska for among other things possession of methamphetamine a Class IV Felony.

H. Logan . . . has failed to provide [Tyler] with safe, stable, and/or appropriate housing.

I. Logan . . . has failed to provide [Tyler] with proper parental care, support, supervision, and/or protection.

J. Due to the above allegations, [Tyler] is at risk for harm.

The State also filed a motion for immediate custody of Tyler, requesting temporary custody be placed with the Nebraska Department of Health and Human Services (DHHS). The juvenile court entered an order granting the State's motion that same day. At no point in these proceedings did Tyler return to Logan's custody or care.

On June 13, 2023, the State filed an amended petition. The amended petition modified paragraph "G" above to read: "On or about May 1, 2023, Logan . . . [pled] guilty to Criminal Attempt- Possession of a Controlled Substance, to wit: Methamphetamine and Failure to Appear for Status Hearing in the District Court of Sarpy County, Nebraska." All other allegations in the amended petition were identical to those found in the original petition. On June 16, Logan pled no contest to paragraphs "A," "B," "C," "G," "I," and "J" of the amended petition, and Tyler was adjudicated to be a child within the meaning of § 43-247(3)(a). The State dismissed the remaining allegations.

The juvenile court entered a disposition order on September 1, 2023. In that order, the court found that DHHS "ha[d] failed to provide reasonable efforts" at that point in the case. See Neb. Rev. Stat. § 43-283.01(2) (Cum. Supp. 2024) (reasonable efforts shall be made to preserve and reunify families to make it possible for juvenile to safely return to his or her home). Several orders were entered by the juvenile court to facilitate Logan's rehabilitation. He was ordered to, among other things, submit to random drug testing, successfully complete "Level 2.1 Intensive

Outpatient" treatment, undergo a psychological evaluation, maintain a stable and legal source of income, obtain and maintain safe and adequate housing, successfully complete parent-child interactive therapy, and participate in visitation with Tyler.

On December 18, 2024, the State filed a second motion for termination of parental rights, pursuant to Neb. Rev. Stat. § 43-292(2), (4), and (6) (Reissue 2016). The State's motion alleged that Logan had substantially and continuously or repeatedly neglected and refused to give Tyler necessary parental care and protection; Logan was unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct was seriously detrimental to the health, morals, or well-being of Tyler; reasonable efforts to preserve and reunify the family failed to correct the conditions that led to the adjudication of Tyler under § 43-247(3)(a); and termination of Logan's parental rights was in Tyler's best interests. Logan entered a denial as to all allegations in the State's motion.

## 2. TERMINATION HEARING

The hearing on the State's second motion for termination of parental rights was conducted over 4 days in June 2025. The State called several witnesses to testify, and numerous exhibits were received into evidence. Logan testified, offered his own exhibits, and called his housemate's son as a witness to testify on his behalf.

### (a) Foster Placement

After his removal from Logan's custody in April 2023, Tyler moved between multiple foster placements within a short period of time due to problematic "behaviors." He was eventually placed with Dr. Wallace P., Jr. (Wallace) in July. According to Wallace, he was Tyler's sixth foster placement. Tyler remained in Wallace's care at the time of the termination proceedings. Upon cross-examination by Logan, several of the State's witnesses, including the ongoing DHHS caseworker, Daniele Votava, conceded that frequent changes in foster placements can have adverse effects on a child.

Wallace testified that when Tyler first came into his care, he was "all over the place." Tyler would scream, cry, and defecate/urinate under a bed; his outbursts would last anywhere from 2 to 10 minutes. Wallace also received daily reports from Tyler's school about destructive conduct. These behaviors included throwing objects at instructors, spitting, hitting, kicking, and attempting to flee from the building. Wallace used to teach but changed jobs in order to "put more focus into Tyler" and ensure his availability in case Tyler had tantrums at school. At the time of the termination hearing, however, Wallace explained that Tyler had come a "mighty long ways." Problematic behaviors in the foster home had greatly decreased, and the school reported that Tyler did a "180-degree turn." In Wallace's opinion, Tyler needs "love," "direction," and "stability" from a caregiver.

### (b) Visitations

A large topic at the termination hearing was the nature of Tyler's supervised visitation with Logan. Several witnesses provided insights into the quality of those interactions, including the appropriateness of Logan's conduct and how the visits affected Tyler's overall well-being.

*(i) Wallace's Testimony*

Wallace testified that Tyler had "consistent" supervised visits with Logan over the life of the case. There were "maybe four or five times" where Logan could not be contacted when a visit was scheduled to occur and "no more than two or three" times where Logan cancelled a planned visit ahead of time.

Despite this relative consistency, Wallace "felt" that Logan would "manipulate[]" Tyler during visits by making false promises, leading to a cycle of "breakdown[s]." After visits, Tyler reported that Logan was building him "a big red house" with a swimming pool, that he promised a pet dog, and that he informed Tyler his "sleepover" with Wallace was "almost over." At the time of the termination hearing, Tyler was beginning to question whether Logan would keep these promises, asking Wallace, "[W]hen is somebody going to tell me the truth?" Wallace also testified that, about 6 or 7 months before the commencement of termination proceedings, Tyler wept after Logan told him he would stop eating "because they were going to take [Tyler] away." Logan also told Tyler to "jump out of the window" and "run." These statements greatly upset Tyler. Wallace indicated that Tyler struggled both emotionally and behaviorally after returning from visits with Logan.

*(ii) Visitation Workers' Testimony*

The State called three separate visitation workers, who testified to specific visits that occurred between October 2024 and March 2025.

In October 2024, Richard Beebe supervised a visit between Logan and Tyler. The visit was planned to take place at Logan's apartment. Upon arrival, Beebe could not contact Logan. After waiting around 30 minutes, Beebe noticed Logan exit an apartment. Beebe testified that Logan "looked like he had been awake all night," appeared "disoriented," and was "distracted." The visit lasted around 4 hours, and Logan and Tyler spent most of the time lying in bed. Beebe noticed that Logan fell asleep "[a] few times," and Tyler had to wake him up.

Anderson Lopez testified that he supervised "between three and five" visits of Logan and Tyler. Although Lopez indicated that visits generally "went pretty well," he stated that Logan would get upset or frustrated during a "majority of them." Logan would express "visible anger," raise his voice, and clench his teeth. Lopez specifically testified about a December 2024 incident where Logan "slap[ped] Tyler across the face" after his son became dysregulated at the end of a visit. After being hit, Tyler "seemed very shocked" and "became wide-eyed."

Olivia Wiest supervised two visits in early 2025. The first, occurring in January, took place at a restaurant. Shortly after receiving their food, Logan recognized a police officer across the street. Without giving notice to Wiest, Logan "quickly" exited the restaurant with Tyler. According to Wiest, Tyler "did not want to go." Upon reaching the police officer, Logan encouraged Tyler to ask the officer a question. Tyler refused, so Logan asked the officer, "[W]hy [do] police officers treat black people different than white people?" Wiest described Tyler as being "quiet" during Logan's interaction with the officer.

Wiest supervised another visit in March 2025. During that visit, Wiest overhead Tyler tell Logan that he was "worrie[d]" because Logan had told him that he was "going to stop eating." Later in the visit, Logan and Tyler, without asking permission, rode together on a motorized scooter. Wiest expressed concern about the way Logan drove the scooter, noting his "speed" and

his conduct of "going back and forth in the street." However, there were no cars or other vehicles in the area. At the conclusion of the visit, Logan gave Tyler a binder of trading cards. Wiest described the binder as "smell[ing] like pet urine."

### (iii) Caseworker's Testimony

Caseworker Votava testified that Logan was largely consistent in visitations with Tyler. However, she received reports that Logan was "quick to anger" during visits. She testified to a statement Logan made in May 2025 wherein he indicated that "he fucking hates when [Tyler] does not listen." It was also reported that Logan would "chastis[e] Tyler for his behavior" and tell him he was "the reason that he was not home." In March, Tyler disclosed to Votava that he has nightmares because Logan told him he was "going to stop eating" if Tyler gets "taken." During her testimony, Votava stated Tyler struggles with emotional dysregulation after visits with Logan.

There were also concerns that Logan was "focus[ing] on female [visitation] workers." According to Votava, three female workers were removed from Logan's case. One of the workers reported that Logan asked her "to have sex with him in a text message." When confronted with the allegation, Logan denied the incident, advising he would "not talk to women that way." Despite being admonished by Votava, a subsequent visitation worker disclosed that Logan was "making comments that made her feel uncomfortable." Votava believed Logan's behavior demonstrated "poor boundaries" to Tyler.

### (c) Therapists' Testimony and Opinions

The State called two therapists as witnesses at the termination hearing. The first was responsible for Tyler's individual therapeutic needs, and the second oversaw parent-child interaction therapy (PCIT) between Tyler and Logan.

### (i) Tyler's Individual Therapy

Tyler began weekly sessions with Rebecca Nichols, his individual therapist, in September 2024 after Tyler's school made a referral due to his "behavioral issues." Prior to seeing Nichols, Tyler had preexisting diagnoses for "adjustment disorder," "ADHD," and "conduct disorder." Nichols testified that Tyler's "emotional dysregulation" and "behavioral issues" are consistent with an adjustment disorder diagnosis. However, at the time of the termination hearing, Nichols indicated that Tyler's behaviors were "a lot better" and "not so significant." According to Nichols, Tyler was "maintaining in the classroom," and the school reported less dysregulation. In Nichols' professional opinion, Tyler's behaviors had improved to the point where she would no longer describe Tyler as suffering from conduct disorder. She further opined that Tyler's primary caregiver needs to provide him with physical, emotional, and mental "stability" and set appropriate boundaries. Nichols believed Tyler's best interests require "consistent relationships" and permanency. On cross-examination by Logan, Nichols noted that severing a parent-child bond could "[p]otentially" be traumatic to Tyler.

In March 2025, Nichols wrote a letter to caseworker Votava opining on the impact that alleged statements made by Logan could have on Tyler's well-being. (Nichols did not hear of these statements directly from Tyler; they were relayed to Nichols by Votava.) In the letter, Nichols wrote that Tyler was exposed to "concerning conversations during visits with Logan." Logan

purportedly told Tyler to "'get a rope and go out a window and run away if he was taken from him.'" In Nichols' opinion, repeated exposure to this type of "[n]egative communication" can lead to anxiety, depression, and feelings of insecurity in Tyler; undermine Tyler's self-esteem; hinder Tyler's ability to form healthy interpersonal relationships; lead to aggression, defiance, or social withdrawal in Tyler; and impede Tyler's academic performance.

Logan objected to the letter as hearsay. However, the State noted it was offering the letter "primarily" to prove the impact of Logan's statements on Tyler's mental health, assuming that the statements were actually made. It requested the juvenile court look to "other evidence" outside the letter to determine whether Logan did, in fact, make the statements to Tyler. The court overruled Logan's objection and received the letter as evidence, with the State's "caveat."

### (ii) PCIT

Logan began weekly PCIT sessions with Kate Sorrell in June 2024. According to Sorrell, PCIT is a "short-term," "two-phase treatment" designed to "establish secure, safe attachments" between a child and caregiver and to assist caregivers in "manag[ing] problem behaviors." PCIT usually lasts around "14 to 16 weeks." The first phase of PCIT, child-directed intervention (CDI), is designed to improve child attachment to the caregiver and promote self-esteem and concentration in the child. The second phase, parent-directed intervention (PDI), teaches a caregiver how to manage a child's problematic conduct. Sorrell testified that "one of the biggest components of PCIT" is "special playtime" that caregivers are assigned to do with the child outside of formal sessions.

Sorrell indicated Logan was "pretty consistent" with his PCIT appointments, noting there were only "a couple times" when he arrived too late to begin a session. As Logan progressed through CDI, he "started to struggle with being receptive to [Sorrell's] prompts" due to feeling "overwhelmed," "worried about his son," and "stress[ed]." Logan also reported that he felt "targeted" by his caseworker. Logan was not able to fully master CDI, and Sorrell doubted whether Logan was practicing the necessary skills outside of formal appointments. According to Sorrell, "[m]ost people" are able to master CDI "very easily" "with practice."

Despite Logan's inability to completely master the CDI stage of therapy, Sorrell made the decision to advance him to the PDI phase. However, Logan "stalled in any progress." PCIT was paused in November 2024 after Logan entered inpatient drug treatment. Sorrell later discharged Logan in January 2025 after learning about impending termination proceedings. In a discharge letter received by the juvenile court, Sorrell wrote: "During the months of September, October and November [2024], Logan was no longer mastering the child directed interaction and had not mastered the parent directed interaction portion of treatment."

Sorrell testified to a "significant escalation" which occurred during an October 2024 PCIT session. During the incident, Tyler became dysregulated and engaged in physical aggression, spitting, cussing, screaming, and property destruction. Sorrell gave Logan several prompts to address Tyler's conduct, but Logan was not responsive to her coaching. As a result, Sorrell had to use a "physical intervention" on Tyler, and he remained escalated for "about two hours."

Sorrell believed that Tyler needs consistent structure and caregiving. Although Sorrell observed Logan to be "consistently nurturing" to Tyler, she thought Logan was inconsistent in

responding to Tyler's problematic behaviors and failed to regularly use the caregiving skills taught in PCIT.

During cross-examination, Logan offered a July 2024 email that Sorrell had sent to his attorney. In the email, Sorrell wrote that PCIT was "progressing well." She also stated that Tyler and Logan "appear to have a loving and nurturing relationship and enjoy play time together." However, upon redirect examination by the State, Sorrell clarified that Logan's "backslide" and "big stall in progress" occurred after the email was sent.

### (d) Drug Use, Testing, and Treatment

At the time of Tyler's removal in April 2023, a major concern was Logan's use of illicit drugs, particularly methamphetamine. The State adduced evidence relating to Logan's history of drug testing and treatment.

### (i) Drug Testing

Logan was referred to two different entities for drug testing. The first company, Owens & Associates, Inc. (O&A), provided testing services throughout Logan's case. Records from O&A were received by the juvenile court. These records show Logan missed 92 of the 213 drug tests offered. On September 6 and October 28, 2024, Logan returned "presumptive positive" tests for methamphetamine. Logan was also referred to Nebraska Drug & Alcohol Screening three separate times. The first and second referrals were in August 2024, and no specimens were able to be collected from Logan during either referral. The third referral occurred in April 2025, and although a tester was able to contact Logan on a single occasion, no urine sample was provided. Logan told the tester "that he could not urinate."

At the termination hearing, evidence was adduced showing that Logan manipulated drug tests. According to caseworker Votava, in December 2024, Logan advised her that "he was messing with his urine." Votava also testified that O&A reported Logan's urine was being "diluted" and that human urine was not being provided during drug tests. Notes contained in O&A's drug testing records show several instances where Logan cut his fingernails and hair to the point where testable specimens could not be extracted, despite being warned. One O&A worker had suspicion that Logan was chemically altering his hair with dye.

### (ii) Drug Treatment

The State elicited extensive testimony from caseworker Votava regarding Logan's treatment for substance abuse.

According to Votava, Logan participated in several intensive outpatient programs (IOP) throughout the case. Prior to Votava's involvement in the case, Logan was working with an IOP provider. However, treatment with this provider was "paused" twice after Logan was incarcerated "on two occasions." Votava received reports from the provider that Logan was "making minimal progress" and had "attendance issues." This initial IOP provider paused treatment again in October 2023 due to "missed sessions."

In February 2024, Logan enrolled himself in another IOP, but he was unsuccessfully discharged "due to attendance issues." Votava indicated Logan was in this second program for a

"short time." Logan again enrolled in IOP in April and successfully completed treatment. However, Votava testified that Logan tested positive for methamphetamine in October.

As a result of his positive drug test, a chemical dependency evaluation was conducted, and inpatient treatment was recommended. In November 2024, Logan enrolled in an inpatient drug treatment program. However, according to Votava, Logan "miss[ed] sessions" and tested positive for methamphetamine upon entry into the program. Around this time, Logan disclosed to Votava that "he ha[d] been using every day of this case." Logan successfully completed inpatient treatment in December. Logan participated in IOP again in January 2025. The IOP provider reported to Votava that Logan tested positive for methamphetamine, but he successfully completed treatment.

(e) Caseworker's Testimony and Opinion

Caseworker Votava was the State's last witness at the termination hearing. Votava was assigned to Logan and Tyler's case in September 2023. Votava testified that prior to her involvement in the case, Logan was making "[m]inimal progress" in satisfying the juvenile court's orders. However, during cross-examination by Logan, she acknowledged that DHHS was failing to make reasonable efforts to assist Logan during that point in the case.

Votava had inconsistent contact with Logan throughout her time on the case. According to Votava, communication with Logan was challenging because of his use of profanity, the difficulty in keeping him "on task," and his inability to take accountability. Votava testified to one September 2023 incident where Logan "attempted to throw a phone" at her face during an in-person meeting. Logan largely failed to comply with or provide adequate proof of compliance with the juvenile court's orders during Votava's involvement.

Votava testified that Logan was incarcerated a total of four times in 2023 for violations of pretrial release. He was jailed for anywhere between "a few days" and "two and a half weeks." In January and February 2025, Votava learned of two warrants for Logan's arrest. One was for driving under suspension, and the other was for failure to pay child support. Logan was arrested in May and incarcerated for 3 days for driving under suspension. Logan's child support obligation was also resolved in May.

Votava expressed concerns about Logan's ability to provide necessary psychiatric care for Tyler. At the beginning of the case, Tyler's psychiatrist recommended medication. After the medication was prescribed, Logan became "elevated" and "verbally aggressive" during meetings with Tyler's psychiatrist. Logan was concerned that the medication would give Tyler "man tits." While Votava respected Logan's objection to the medication, she took issue with his combative conduct toward healthcare professionals, which made Tyler "noticeably uncomfortable."

At the time of the termination hearing, Logan lived at a residence in north Omaha, Nebraska, with an "older woman," Kay S. After performing a background check on Kay, Votava discovered a report filed with Adult Protective Services indicating that Kay had "been taken advantage of in the past." According to Votava, the reporter expressed concern that Logan had access to Kay's debit card and pin number.

Votava opined that it was in Tyler's best interests to terminate Logan's parental rights. She explained:

I believe that it's in [Tyler's] best interest[s] because he has been in out-of-home care for approximately 25 months and the reasons that this case came to the attention [of the

juvenile court] have not been fully addressed. I'm concerned about [Logan]'s sobriety and his ability to meet his son's needs. And Tyler deserves permanency.

### (f) Logan's Evidence

Joel S., Kay's son, was called as a witness to clarify Logan's living arrangement in the north Omaha residence. Joel testified that Logan moved into Kay's home after performing "handyman" work for her. According to Joel, a group of individuals, including his niece, made unauthorized purchases using Kay's debit card in the summer of 2024, totaling around $10,000. Joel was initially "concerned" that Logan may have been involved in the scheme because he had access to the debit card. However, Joel testified that his worries subsided after Logan told him that "parameters were set" by Kay. However, Joel did not know for certain if Logan had ever made any unauthorized purchases with Kay's debit card. During cross-examination, it was revealed that Logan used to date Joel's niece, but Joel did not believe they were in a relationship at the time the unauthorized purchases were made.

Logan also testified. At the time of his testimony, Logan was enrolled as a full-time student at a local community college, working on an associate degree in industrial maintenance technology. Logan explained that it had "been the highlight of [his] life watching [Tyler] grow" over the years and that Tyler "gives [him] a purpose." Logan testified that he loves Tyler "very much," and he has "no doubt" that Tyler loves him. In Logan's opinion, Tyler "struggled significantly" during his time in foster care.

On cross-examination by the State, Logan admitted that he failed to comply with several of the juvenile court's orders but claimed there had been "conflict" and "misrepresentations" throughout the case. He conceded that he was using illicit drugs during the "first part" of the case and that he was "altering [drug] tests." However, Logan was adamant that he had "lengthy periods of sobriety" and denied telling Votava that he was using drugs on a daily basis. Logan agreed that some of Tyler's problematic behaviors stem from him being "stuck" in foster care for so long; he believed that if Tyler remained in foster care indefinitely, it would have "lasting detrimental effects."

### 3. JUVENILE COURT'S DECISION

On July 22, 2025, the juvenile court entered an order terminating Logan's parental rights to Tyler. It concluded that statutory grounds for termination existed pursuant to § 43-292(2), (4), and (6) and that termination of Logan's parental rights was in Tyler's best interests.

Logan appeals.

## III. ASSIGNMENTS OF ERROR

Logan assigns that the juvenile court erred in finding that statutory grounds exist to terminate his parental rights under § 43-292(2), (4), and (6), and finding termination of his parental rights is in Tyler's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate

court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the children's best interests. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000).

### 1. STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Logan's parental rights to Tyler under § 43-292(2), (4), and (6). The juvenile court found all three grounds existed by clear and convincing evidence. On appeal, Logan argues the State failed to carry its burden to prove any of the alleged statutory bases. In our de novo review of the record, we focus our inquiry on the evidence related to Logan's drug use.

Section 43-292(4) allows for termination of parental rights when a parent is "unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile." In its order terminating Logan's parental rights, the juvenile court expressed "concern[]" that Logan "is not a sober parent." It specifically highlighted Logan's inconsistent participation in drug testing throughout the case, noted that he was tampering with his tests, and pointed to multiple positive results for methamphetamine. Upon our de novo review of the record, we agree with the juvenile court's findings and conclude they are supported by clear and convincing evidence.

Drug testing records received by the juvenile court showed "presumptive positive" tests for methamphetamine in September and October 2024. Caseworker Votava also indicated that Logan tested positive for methamphetamine when he entered inpatient treatment in December and again during IOP treatment in January 2025. While these four positive tests, standing alone, may not rise to the level of "habitual use" as contemplated in § 43-292(4), other evidence supports the juvenile court's finding that Logan "is not a sober parent." Votava testified that Logan disclosed "he ha[d] been using every day of this case." We also note that in his brief, Logan candidly admits that he "relapsed" during the case. Brief for appellant at 36. Although Logan denied daily drug use during his testimony, he readily conceded he "used" during the "first part" of the case and that he was "altering [drug] tests." Logan's admission that he was tampering with his drug tests provides a strong inference that he was concealing ongoing, habitual drug use, thereby undermining the reliability of negative tests and calling into question his overall credibility.

However, in order to support termination under § 43-292(4), the State must also prove that a parent's habitual drug use is "seriously detrimental to the health, morals, or well-being of the juvenile." Here, there was ample evidence to show that Logan's continued use of methamphetamine was seriously detrimental to Tyler's emotional well-being. Tyler was initially removed from Logan's custody and care due, in part, to Logan's struggle with substance abuse.

- 10 -

Logan has not rehabilitated to the point where Tyler can safely return home. Although Tyler's behavior has significantly improved during his time in foster care, Wallace explained that repeated transitions between visits and the foster home has led to a continuous cycle of "breakdown[s]" in Tyler. According to Wallace, these breakdowns stemmed from Logan's many false promises to Tyler that his "sleepover" at the foster home was almost over. Multiple witnesses testified that Tyler needs stability, permanency, and consistency in a caregiver. Logan's continued use of drugs has left Tyler in a kind of procedural limbo, preventing him from achieving stability and permanency. This has been detrimental to Tyler's emotional well-being.

Section 43-292(6) also authorizes termination of parental rights where reasonable efforts to preserve and reunify the family, under the direction of the juvenile court, have failed to correct the conditions leading to the determination that the juvenile is one as described in § 43-247(3)(a). In its September 2023, disposition order, the juvenile court ordered Logan to undergo random drug testing to address concerns related to his substance abuse. This order remained constant throughout the case. The drug testing records received at the termination hearing show that Logan failed to consistently submit to testing, and as mentioned above, Logan admitted to altering tests. Perhaps most notably, upon cross-examination by the State, Logan conceded that he had failed to comply with the juvenile court's plan of rehabilitation, stating he was unable to "hold up [his] end of the arrangement." The evidence adduced by the State clearly and convincingly showed that Logan was unable to address his substance abuse issues and consistently engage in random drug testing.

Upon our de novo review of the record, we find the State adduced clear and convincing evidence that statutory bases for termination existed under § 43-292(4) and (6). If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Mateo L. et al., supra*. As such, we need not address the juvenile court's findings related to § 43-292(2).

2. BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C., supra*. This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it in detail again here.

Although the record clearly demonstrates that Logan and Tyler deeply care for and love each other, upon our de novo review, we agree with the juvenile court that Tyler's best interests are served by terminating Logan's parental rights. We are particularly alarmed by the evidence of Logan's emotional manipulation of Tyler. At the termination hearing, witnesses testified that Logan made false promises and other statements that were greatly upsetting to Tyler. Logan specifically threatened to "stop eating" if his parental rights were terminated and encouraged Tyler to "jump out the window" of his foster placement and "run." Statements like these caused Tyler to have nightmares and led to emotional turmoil and dysregulation. A letter authored by Tyler's individual therapist opined that this kind of "[n]egative communication" could lead to anxiety and depression in Tyler; have a detrimental impact on Tyler's ability to form healthy interpersonal relationships; cause aggression and defiance; and hinder Tyler's studies at school.

We are also cognizant of the evidence regarding Logan's continued use of methamphetamine throughout the life of this case. As set forth previously in our analysis, despite successfully completing both intensive inpatient and outpatient drug treatment programming, Logan still struggles with substance abuse, as evidenced by his self-disclosure to caseworker Votava that he had been "using" daily and his several positive drug tests. Although Logan argues in his brief that the "path to sobriety is filled with stops and backtracks," brief for appellant at 37, by the time of the termination hearing, Tyler had been in an out-of-home placement for over 2 years. When asked by the State whether it was "good" for Tyler to remain in foster care indefinitely, Logan testified it would "have lasting detrimental effects" on his son. We agree. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

The State proved that Logan was unfit, meaning that he has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the child's well-being. See *id.* We further find that there is clear and convincing evidence that it is in Tyler's best interests to terminate Logan's parental rights.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Logan's parental rights to Tyler.

AFFIRMED.